Patrick A. Tighe, Bar No. 033885
Matthew Racioppo, Bar No. 040702
SNELL & WILMER L.L.P.
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
Telephone: 602.382.6000
Facsimile: 602.382.6070
Email: ptighe@swlaw.com
        mracioppo@swlaw.com

*Attorneys for Plaintiff*
*Michelle Pettitt*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michelle Pettitt, | No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| Glen Marvin Lineberry, an individual; Sherry Dorathy, an individual; Bradley D. Beauchamp, an individual; and Miami Unified School District #40, | |
| Defendants. | |

Plaintiff Michelle Pettitt brings this action for deprivation of rights afforded by the Constitution and laws of the United States and Arizona, malicious prosecution, First Amendment retaliation, declaratory relief, and abuse of process against Glen Marvin Lineberry, Sherry Dorathy, Bradley D. Beauchamp, and the Miami Unified School District #40 (the "District") (collectively, "Defendants"). For her Complaint, Pettitt alleges as follows:

**NATURE OF THE CASE**

1.      The U.S. Constitution, including under the First and Fourteenth Amendments, and Arizona law prohibit government officials from abridging freedom of speech, the right to vote, the right to peaceably associate and assemble, and the right to petition for a redress of grievances. Consequently, federal and Arizona law forbids government officials from subjecting individuals to retaliatory actions, including criminal prosecutions, for exercising

their First Amendment rights and for engaging in other protected activity, such as speaking out, criticizing public officials, engaging in political speech, voting, electioneering, and peaceably assembling.

2.     The Due Process Clause of the Fourteenth Amendment and Arizona law also bar government officials from infringing the fundamental rights of parents to make decisions concerning the care, education, and upbringing of their children and from depriving parents of their constitutional rights or other protected rights (including by abridging freedom of speech and the right to assemble and retaliating against those parents because of their speech and association) without due process of law.

3.     This case seeks to vindicate the rights of Michelle Pettitt, an Arizona doctor and mother, who has suffered unlawful and malicious retaliation and prosecution at the hands of the Defendants simply for exercising her constitutionally protected rights.

4.     Specifically, after Pettitt publicly criticized a school official (Lineberry) and filed a state administrative complaint against him, Defendants retaliated against her by:

   a.     Unlawfully banning her from all of the District's property, including from a school where her children attended and where other events open to the public occurred, at all times, and imposing this ban against her without due process;

   b.     Wrongfully obtaining an invalid and void injunction based on false or misleading evidence to further force Pettitt to comply with the District's unlawful ban; and

   c.     Instituting a baseless criminal misdemeanor charge against Pettitt that Defendants quickly dismissed.  Then, when Pettitt exercised her constitutional rights to vote and engage in protected political speech, Defendants escalated their retaliation against her by directing, requesting, and pressuring for the prosecution of Pettitt on groundless felony charges for harassment.  A jury eventually acquitted Pettitt on all criminal charges on January 30, 2025.

SNELL &WILMER

5. By filing this action, Pettitt seeks to uphold her rights, obtain legal and equitable redress, and deter Defendants—and other public officials—from attempting to do the same to anyone else. Defendants must now be held accountable for their malicious and unlawful pursuit of Pettitt. While a verdict in this civil case cannot undo the trauma the Defendants' threat of conviction and incarceration inflicted on Pettitt, she has filed this action to hold Defendants responsible for their appalling violations of the laws.

## THE PARTIES

6. Plaintiff Michelle Pettitt is a licensed naturopathic physician who lives in Miami, Arizona, and operates her medical practice in Globe, Arizona.

7. Defendant Glen Marvin Lineberry is an individual, and this lawsuit is brought against him in both his individual and official capacities. At all relevant times alleged in this Complaint, Lineberry was a resident in Gila County, Arizona. Between July 2014 and June 2023, Lineberry served as the Principal of the Miami Junior-Senior High School.

8. Defendant Sherry Dorathy is an individual, and this lawsuit is brought against her in both her individual and official capacities. Between January 2013 and June 2024, Dorathy served as the Superintendent of the Miami Unified School District #40. She now works for the District as a grant manager. Dorathy is a resident of Arizona, and at all relevant times alleged in this Complaint, she resided in Gila County, Arizona.

9. Defendant Bradley D. Beauchamp is an individual, and this lawsuit is brought against him in his individual and official capacities. Beauchamp is the Gila County Attorney for the Gila County Attorney's Office and served as an assistant coach for the Miami Unified School District #40, including for the Miami Junior-Senior High School's football and baseball teams. Beauchamp is a resident of Arizona, and at all relevant times alleged in the Complaint, he resided in Gila County, Arizona.

10. Defendant Miami Unified School District #40 is a political subdivision of Arizona and located in Miami, Arizona.

## JURISDICTION & VENUE

11. The events giving rise to this lawsuit occurred primarily in Gila County, Arizona.

12. The Court has jurisdiction of the subject matter of this action under 28 U.S.C. § 1331 in that this action arises under the laws of the United States, specially 42 U.S.C. §§ 1983 and 1988 as well as 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

13. The Court has personal jurisdiction over Defendants as they either reside in Arizona or, at all relevant times alleged in the Complaint, they engaged in the tortious acts or omissions that give rise to this lawsuit in Arizona, thereby having sufficient minimum contacts with Arizona.

14. Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims occurred in the District of Arizona, and to the extent § 1391(b)(2) does not apply, this Court has personal jurisdiction over the Defendants in connection with this action.

15. All preconditions for bringing this Complaint against each of the Defendants were fulfilled because sufficient notice that Pettitt may pursue litigation was submitted to the necessary entities, including the Miami Unified School District, and the individual Defendants Lineberry, Dorathy, and Beauchamp within the statutory time for doing so pursuant to A.R.S. § 12-821.01. Moreover, A.R.S. § 12-821.01 does not apply to the claims asserted in this Complaint based on federal law.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### PETTITT ENGAGES IN PROTECTED ACTIVITY BY FILING A COMPLAINT AND PUBLICLY CRITICIZING LINEBERRY, A PUBLIC OFFICIAL

*Pettitt Files Complaint with the Arizona Department of Education Against Lineberry*

16. Between 2020 and 2022, Pettitt had two minor children who attended Miami Junior-Senior High School (the "School"), a combined seventh through twelfth grade school within the District.

- 4 -

17. Pettitt's oldest son, J.C., was a star football player for the Miami Vandals—the varsity football team for the School. Throughout his freshman to senior high school years, J.C. played on the varsity football team and was recruited to play college football.

18. During this time, Lineberry served as Principal and taught economics at the School, and he recognized J.C. as a star football player and "stellar" athlete.

19. During this same time, Beauchamp served as an assistant coach for the School's varsity football team and coached J.C.

20. In October 2020, Lineberry voluntarily—and without court order or subpoena—officiously inserted himself into a child custody dispute between Pettitt and J.C.'s biological father. In particular, at the request of J.C.'s father and the father's counsel, Lineberry drafted and emailed to the father a letter of support to be used as evidence in the custody dispute case. In the letter, Lineberry opined that "any contemplated change of address" for J.C to live with his father "need not change" J.C.'s classes, schedule, or overall academic progress. Lineberry also offered to speak directly with the court.

21. Making matters worse, during this time, Pettitt expressed to Lineberry, in person and by email, her concerns about J.C.'s declining academic performance, absenteeism, and classroom misbehavior and potential ways to address these issues. At one point, Pettitt told Lineberry that she intended to remove her son from the School's football team until his academic performance improved. Lineberry, however, forwarded those emails to J.C., a minor, or responded to Pettitt by copying J.C. on the emails—thereby unnecessarily antagonizing Pettitt's relationship with her minor son during a difficult custody battle.

22. Lineberry improperly inserted himself into Pettitt's custody dispute—and sided with J.C.'s father—because Lineberry did not want Pettitt to remove her son and star football player from the School's football team.

23. In February 2021, Pettitt filed a complaint against Lineberry with the Arizona Department of Education ("AZDOE"), alleging, among other things, that: (a) Lineberry improperly injected himself into a child custody dispute between herself and J.C.'s

biological father; and (b) Lineberry improperly attempted to curry favor with J.C. by sharing his mother's emails and communications with him during the child custody dispute.

24.     In August 2021, Lineberry first learned that Pettitt filed this AZDOE complaint against him when a state investigator contacted him to schedule an interview in early August 2021 to discuss Pettitt's allegations.

25.     The AZDOE complaint infuriated Lineberry.  Indeed, before filing the AZDOE complaint, Pettitt asked Lineberry to provide the complete email correspondence between himself, J.C.'s father, and the father's counsel regarding his letter of support. Lineberry refused and became defiant and angry.  In one email, Lineberry wrote that Pettitt did not have the right to obtain the communication, confusingly writing that "although it is a public record, the parent does not have a right to it as a public record because it is not in the best interest of the District to provide communications about a student" to the parent. When Pettitt followed up again and requested the entire email communication, Lineberry wrote "Enough." and demanded an apology from Pettitt.

*Pettitt Publicly Criticizes Lineberry's Character and Fitness to Serve*
*as the Principal of and Teacher at the School*

26.     In or around January 2010, a jury in Maricopa County, Arizona, found Lineberry—while serving as President and Chief Operating Officer of two art galleries— liable for breach of fiduciary duties and breach of contract for essentially stealing commissions and other monies owed to his employer.  The jury found that Lineberry wrongfully diverted his employer's commissions to himself and a company that Lineberry created in which he was the sole owner.

27.     In March 2010, the Maricopa County Superior Court entered a final judgment against Lineberry for his breaches of fiduciary duties and contract, totaling over $7 million of civil liability against Lineberry and his now ex-wife.

28.     After entry of the final judgment, Lineberry and his ex-wife filed for Chapter 11 bankruptcy.  The Bankruptcy Court eventually determined that a portion of the final

- 6 -

judgment was not dischargeable due to Lineberry's "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

29.    In the summer of 2021, Pettitt learned about Lineberry's checkered past (including the above-mentioned fraud and misappropriation of funds) and began to publicly raise legitimate concerns about his suitability to serve as the Principal of the School, particularly given that, as Principal, Lineberry helped manage and oversee the School's budget, finances, and grant money.

30.    For instance, on July 13, 2021, Pettitt publicly exposed and called attention to Lineberry's civil judgment through a Facebook post, a true and accurate copy of which appears below:



31.    Similarly, on August 18, 2021, Pettitt emailed others at the School in which she again called attention to Lineberry's prior civil liability and questioned his character and fitness as a principal and teacher at the School, asking "Ever wonder how a HS teacher will ever pay back the more than 7 million he embezzled?" The email contained links to articles about Lineberry's civil judgment and bankruptcy proceedings.

32. Lineberry saw, read, and knew about Pettitt's public criticisms of him, even admitting in writing that "Pettitt posted documents from the lawsuit I was involved in nearly 15 years previously" on Facebook and in her August 2021 email.

33. Pettitt's public criticisms enraged Lineberry, who thereafter schemed with Dorathy and Beauchamp to bully and retaliate against Pettitt for speaking out, criticizing him, and filing a complaint against him with the AZDOE.

**DEFENDANTS BEGIN TO RETALIATE AGAINST PETTITT, INCLUDING BY BANNING HER AND OBTAINING AN INJUNCTION FORCING PETTITT TO COMPLY WITH THAT UNLAWFUL BAN**

*Dorathy and Lineberry Impose a Baseless and Facially Unreasonable "Parent Management Contact Management Plan" Against Pettitt*

34. Seven days after Pettitt sent her August 18, 2021 email publicly criticizing Lineberry, on August 25, 2021, Dorathy—as Superintendent and on behalf of the District—delivered a letter notifying Pettitt that the District decided to prospectively ban her from all of the District's property for an indefinite period of time. Dorathy copied Lineberry on the letter. A true and accurate copy of the letter is attached to this Complaint as Exhibit 1.

35. In the letter, the District unequivocally stated in bold: "**[Y]ou may not come onto District owned property at any time unless your presence falls within the exceptions delineated below.**" The District defined the District's property to include all of the "MJSHS buildings, Dr. Charles A. Bejarano Elementary School, Lee Kornegay School, Auditorium, Gymnasium, athletic fields, Ragus Stadium, MUSD parking lots, and ***any other property owned or controlled by [the District]***." (emphasis added). The District defined "any time" to include "the instructional day, any extracurricular school activity, any athletic competition or student performance, any school- or district-sponsored event, ***or any event hosted on campus by an outside organization***." (emphasis added).

36. While Dorathy and the District characterized this policy as a "parent contact management plan," it was in effect a categorical and prospective ban on Pettitt's presence on the District's property at any time.

- 8 -

37.     The District did not specify in its letter how long Pettitt was banned from all District property, thereby imposing an indefinite ban against her.

38.     The District's property at issue is, at a minimum, a limited public forum, and some of the indicated property, like the adjoining sidewalks, is a traditional public forum.

39.     The District, Lineberry, and Dorathy afforded Pettitt no process before or after imposing a sweeping, categorical, and indefinite ban from the District's property at any time and for any purpose.

40.     The District, Lineberry, and Dorathy never provided any warnings to Pettitt, let alone afforded her any notice, before imposing this ban, and the District made the ban effective immediately.

41.     The District, Lineberry, and Dorathy afforded Pettitt no pre-deprivation or post-deprivation hearing or appeal, including to challenge the ban or the articulated reasons for the ban, or to request reasonable modifications or changes to the ban.

42.     The District, however, provided four narrow exceptions to the ban: (1) Pettitt could come onto the District's property for a 15-minute window from 7:30 – 7:45 a.m. to drop off her children for school; (2) she could come onto the District's property for a 15-minute window from 3:30 – 3:45 p.m. to pick up her children from school; (3) if the school requested the emergency pick up of Pettitt's children, she could briefly come onto the District's property for that purpose only; or (4) if Pettitt wished "to attend a school event involving her minor child in her custody," she had to request permission to attend the event by emailing both Lineberry and Dorathy "no later than noon two (2) school days before the event," and Lineberry would approve or deny the request "with reasonable promptness" and could condition any approval on Pettitt having to comply with other "time, parking arrangements, or other requirements" as determined unilaterally by Lineberry or Dorathy.

43.     The District also stated that Pettitt could "submit questions, suggestions or concerns about [her] children's education *via email at any time*." (emphasis added).

- 9 -

44.     During the ban, events occurred at the School that were open to the public or to all parents of children attending the School, which Pettitt was prospectively banned from attending.

45.     The District claimed that it implemented this ban to "protect the staff from unwarranted verbal abuse, intimidation and unfounded allegations and to minimize campus or disruptions [sic] in the future."

46.     The District's letter detailed some purported "examples" that justified this ban, but these examples are either false, fabricated, grossly mischaracterized, or misleading.

47.     For example, in the letter, Dorathy claimed that "[o]n April 1, 2021, you emailed the Superintendent demanding to know why you were excluded from knowledge about an overnight student event in the gymnasium.  The event did not exist."

48.     This supposed example, however, is a false and inaccurate description of the email.  On April 1, 2021, Pettitt emailed Dorathy, with the subject line of "School event Friday April 2nd," and stated as follows:

> **Subject**: School event Friday April 2nd
> **From**: "Dr. Pettitt" <drmpettitt@gmail.com>
> **To**: Sherry Dorathy <sdorathy@miamiusd40.org>
> **Date Sent**: Thu, 1 Apr 2021 09:22:36 -0700
> **Date Received**: Thu Apr 01 16:22:36 UTC 2021
>
> Hello Dr.  Dorathy~
>
> Justin tells me that he is attending a school event that is scheduled through the night, although I cannot seem to find any information on this to confirm.
>
> Can you send me the email or flyer or any information on this school event please.
>
> Thank you,
>
> Michelle Pettitt

49.     Dorathy responded, stating:

> **Subject**: Re: School event Friday April 2nd
> **From**: Sherry Dorathy <sdorathy@miamiusd40.org>
> **To**: "Dr. Pettitt" <drmpettitt@gmail.com>
> **Date Sent**: Thu, 1 Apr 2021 15:00:52 -0700
> **Date Received**: Thu, 1 Apr 2021 15:01:03 -0700 (PDT)
>
> Ms. Pettitt,
> There are no "overnight" events planned through the end of this year or any year.  I do not know what Justin is referring to.  There is a dance tomorrow night and if he is on the committee to clean up, they may not be through until 11:30 p.m to 12:00 am.  However, that is the only event that would require a "late" evening.
> Sincerely,

50.    In reply, Pettitt simply stated: "Thank you."

51.    A true and accurate copy of this April 1, 2021 email exchange is attached to this Complaint as Exhibit 2.

52.    Nowhere in this entire email exchange does Pettitt demand to know why she was excluded from knowing about this event.  Nowhere does she use the term "overnight." Rather, she politely asked if there was a "school event" that was "scheduled through the night" on Friday, April 2.  And Dorathy confirmed that such an event existed, stating that there was a school dance scheduled on Friday, April 2, with the student clean-up committee ending between 11:30 p.m. and 12:00 a.m.  A school dance taking place through 11:30 p.m. to 12:00 a.m. is clearly an event taking place "through the night" and into the morning. Thus, contrary to the District's letter, this event did, in fact, exist, and Pettitt did not demand to know about a nonexistent event.   Pettitt's April 1 emails were not threatening, intimidating, or harassing in any way.

53.    Similarly, the District complained of alleged statements made by Pettitt back in "September 2017."  Not only are the District's allegations about events taking place in September 2017 untrue, but the District nowhere explains how purported statements made *almost four years earlier* in *September 2017* somehow warrant a categorical, prospective, and indefinite ban from the District's property in *August 2021*.

54.    All of the District's articulated reasons for the ban are false, misleading, or gross distortions.  Instead, they are mere pretext to retaliate against and bully Pettitt for, among other things, filing an AZDOE complaint against Lineberry and publicly criticizing Lineberry's character and fitness as a principal and teacher given the civil judgment against him for essentially stealing over $7 million from his former employer.

55.    Tellingly, the District's own August 25, 2021 letter indicates that Dorathy and Lineberry targeted and singled out Pettitt for engaging in protected activity, including under the First Amendment.  Dorathy states that she and Lineberry instituted this ban because Pettitt had "filed complaints" (including the AZDOE complaint) and sent an "August 17,"

2021 email to School community members about Lineberry's prior employment history, resulting civil judgment, and findings of fraud and defalcation.

56.    Dorathy explained in the letter that she had final and ultimate decision-making authority to implement this ban against Pettitt, stating: "As Superintendent, I am exercising my authority to impose restrictions on you to avoid further disruption to the District's educational or other operations."

57.    Lineberry consulted and advised Dorathy about the District's ban and agreed to imposing it against Pettitt.

58.    Along with this ban, Lineberry and Dorathy had the District's IT Department block Pettitt from emailing anyone at the District other than them.  Consequently, Pettitt could not email any of her sons' teachers or advisors.

59.    Before notifying Pettitt of this ban, Lineberry, Dorathy, and other District employees told others in the Miami-Globe community about this ban, including J.C.'s football team, J.C.'s father, and the father's counsel in the custody dispute involving J.C.

60.    For instance, on August 8, 2021—17 days *before* Pettitt received notice of the District's ban—the father's counsel emailed Pettitt's counsel, stating: "I'm told your client has been banned from Miami High School as a result of her conduct and can not [sic] even go to his football games."  Pettitt and her counsel had no idea what this statement concerned because, as of August 8, 2021, she had not been notified that she had been banned from the District's property.

*Pettitt Complies with the District's Unlawful and Unreasonable Ban*

61.    The District's ban against Pettitt is unconstitutional and unlawful under both federal and Arizona law.  Lineberry, Dorathy, and the District imposed this ban against Pettitt in retaliation for exercising her First Amendment rights and for engaging in other protected activity, including criticizing the School's officials (including Lineberry) and filing a complaint against him with AZDOE.

62.    The District's ban prohibits Pettitt from accessing the District's property for any athletic events, school board meetings, parent-teacher conferences, graduations or

- 12 -

ceremonies, voting and election-related activities, community functions, or any other events that are open to the public. It thus precluded Pettitt from meeting other parents and community members and discussing issues of common concern.

63.    In so doing, this ban infringes upon Pettitt's First Amendment rights, including the right to vote, to electioneer and engage in political speech, to petition, and to peaceably assemble and associate.

64.    For example, in 2022, Pettitt's assigned polling place for voting was at the School, which is located on the District's property. Consequently, under the District's ban, Pettitt was prohibited from accessing the District's property to vote.

65.    To try and avoid any perceived violation of the District's ban, Pettitt was forced to email Lineberry and Dorathy to obtain permission to access the District's property to vote. On August 2, 2022—Arizona's primary election day—Pettitt emailed Dorathy and Lineberry and notified them that she would be on the School's campus to vote. Dorathy responded by dictating where Pettitt could park, writing: "Please park in the student parking lot in order to have the easiest access to the voting room." Thus, the District, Dorathy, and Lineberry continued to affirm the ban's ongoing existence and scope. This burden on her right to vote was unlawful.

66.    Under the ban, Pettitt is prohibited from attending any school board meetings on the District's property, and as a result, Pettitt did not attend some school board meetings to which she had a right and wished to attend.

67.    The ban excludes Pettitt from attending any sporting events on the District's property (which are open to the public) unless her sons are involved in the event. Further, because of the ban, Pettitt was excluded from attending sporting events involving her children unless she obtained permission to attend two school days in advance of the event.

68.    For example, Pettitt missed J.C.'s football game on Friday, August 27, 2021, because of the ban. J.C.'s father, however, did attend the game and even sat and schmoozed with Lineberry.

69.     Under the ban, Pettitt could attend a school event on the District's property only if it involved "a minor child in her custody." When J.C. graduated in 2022, he was no longer a minor, and he was no longer in Pettitt's custody as he was living with his father. In short, on its face, the District's ban excluded Pettitt from attending her own son's high school graduation—an event made open to the public.

70.     The District's ban is not a reasonable response to the articulated (albeit pretextual) reasons set forth in Dorathy's letter dated August 25, 2021. The ban is not narrowly tailored and fails to impose less restrictive means for addressing the District's purported concerns. More specifically:

a.      As a busy doctor, the District's ban prohibited Pettitt from picking up her sons at different times outside of two 15-minute windows, including for midday doctor's appointments, evening practices and games, and early morning or nighttime school functions.

b.      If Pettitt wanted to attend a school event involving her son, she had to request permission "no later than noon two (2) school days before the event." In practice, because the School was not in session on Fridays, this notice requirement meant that Pettitt had to request permission sometimes five or six days in advance of the scheduled event.

c.      Complicating matters, school events, practices, and games were subject to change with little notice, especially during the COVID-19 pandemic. Because such changes were not announced until the same day or hours before the scheduled time, the ban's notice provision effectively precluded Pettitt from attending rescheduled events.

d.      The District's ban also forced Pettitt to have to decipher what constituted the District's property, which was particularly difficult if the District was holding events at different locations throughout Gila County or the State.

71. In short, through the District's ban, Lineberry and Dorathy imposed requirements that are not only unconstitutional and unlawful but are facially and patently unreasonable for any parent, let alone a professional, working mom. By forcing Pettitt to jump through such hoops, Lineberry and Dorathy were hellbent on punishing Pettitt (and interfering with her relationship with her children) all in retaliation for exercising her First Amendment and other protected rights.

72. Nevertheless, Pettitt attempted to comply—and did comply—with the District's unconstitutional, unlawful, and unreasonable ban.

73. At the beginning of each week, an email was sent from Pettitt's email address stating: "I am requesting to attend any event that [my sons] may be participating in this week on MUSD property."

74. Because Pettitt's youngest son often had athletic games and practices on Mondays and Wednesdays, an email was sent from Pettitt's email address stating: "I am requesting to attend the game Mon." or "I am requesting to attend the game Wed."

75. At times, when Pettitt requested permission to attend certain events, Lineberry falsely claimed that no event was scheduled—even though the School's calendar clearly showed a scheduled event. A true and accurate copy of one such email exchange is attached to this Complaint as Exhibit 3.

76. At other times, if a school event was cancelled, changed, or not taking place on the District's property, Pettitt informed Lineberry and Dorathy that they could disregard her request—further evidencing Pettitt's good-faith attempt to comply with the District's unlawful ban.

77. Pettitt's compliance (even imperfect compliance) with the District's ban further upset and enraged Lineberry and Dorathy, and they then worked together to request and obtain an injunction against harassment against Pettitt based on false, incomplete, and misleading testimony. Indeed, Dorathy ratified, affirmed, and approved Lineberry's actions and decisions.

SNELL & WILMER

*Lineberry Presents False, Incomplete, and Misleading Testimony
to Obtain an Injunction Against Harassment Against Pettitt*

78.    On June 26, 2022, the District itself filed an *ex parte* petition for an injunction against workplace harassment against Pettitt in Maricopa County Superior Court.

79.    Based on information and belief, the District's governing board never authorized this legal action.  Rather, based on information and belief, Dorathy and Lineberry, on behalf of the District, reviewed, approved, and authorized this *ex parte* petition for a workplace injunction against Pettitt.

80.    The petition contained false and misleading allegations and omitted exculpatory information, including, among other things, incorrectly alleging that Pettitt had sent over 200 emails during the past schoolyear (which was untrue) and failing to inform the Court that the District's own ban required Pettitt to contact Lineberry and Dorathy via email to obtain permission to come onto the District's property for events involving her minor sons.

81.    In other words, the District petitioned for an injunction against workplace harassment against Pettitt because the District issued a ban that required Pettitt to email the District for permission to access the District's property and because Pettitt complied with the terms of that unlawful ban.

82.    Two days later, on June 28, 2022, the Maricopa County Superior Court entered an injunction against workplace harassment against Pettitt.  The injunction required Pettitt to "comply with [the] current or amended Contact Plan" and barred her from submitting any "personal complaints about school personnel unrelated to either Defendants' children or school events."

83.    Pettitt requested an evidentiary hearing, which was set for July 25, 2022.

84.    At the hearing, Pettitt appeared without counsel.  The District was represented by counsel.  The District called only one witness, Lineberry, to testify on its behalf.

85.    Lineberry testified that "all the statements made in the petition" were true. He then proceeded to give false and misleading testimony.  For example, he testified that

SNELL
& WILMER

- 16 -

Pettitt sent over 200 emails (which was incorrect); that the District instituted the "contact plan" against her, in part, because she sent an email "wondering why she had been excluded from knowledge about an overnight student event in the gymnasium" and that "the event didn't exist" (which was false as detailed in Paragraphs 47 through 52 of this Complaint); and that she improperly emailed Lineberry to request to attend a non-existent event in June 2022 (when in fact an outside organization, Freeport-McMoRan, was hosting a free "summer splash" and live music event on June 18, 2022 on the District's property open to the public).

86.     Lineberry provided this false and misleading testimony in retaliation for Pettitt for engaging in protected activity, including filing the AZDOE complaint against him and for publicly criticizing his character and fitness as a principal and educator of the School.

87.     Lineberry's false testimony violated Arizona law, including at least under A.R.S. § 13-2702.

88.     After receiving testimony from Lineberry and hearing briefly from Pettitt, the Court reaffirmed its prior injunction against Pettitt and issued an injunction dated July 25, 2022.  This injunction continued to require Pettitt to "comply with [the] current or amended Contact Plan" and continued to bar her from lodging any personal complaints about the District's personnel unrelated to her children or school events.

89.     Arizona law, however, prohibits the issuance of an injunction "that prohibits speech or other activities that are constitutionally protected or otherwise protected by law." A.R.S. § 12-1810(M)(2).

90.     And yet, both injunctions requested by Lineberry and the District, as well as issued by the Court, required Pettitt to comply with the District's "Contact Plan"—the very ban that infringes upon Pettitt's constitutional and statutory rights (including her right to freedom of speech, to vote, to petition, and to peaceably assemble)—and prohibits her from speaking out, complaining, or criticizing the public school officials at issue in this case.

*At Lineberry, Dorathy, and Beauchamp's Request, Pettitt Is Charged with a Misdemeanor, and Shortly Thereafter, the Misdemeanor Action Is Dismissed After Consultation with Lineberry*

91.    In early July 2022, Deputy Winget of the Gila County Sherriff's Office contacted and met with Pettitt at her medical office.  During this meeting, Deputy Winget indicated that the Sheriff's Office had been contacted by the District's attorney on behalf of the District, Lineberry, and Dorathy.  Deputy Winget stated that Pettitt had been accused of sending three purported emails to purportedly harass Lineberry and Dorathy.  Deputy Winget stated that "they wanted an arrest" of Pettitt for these emails.

92.    Pettitt understood Deputy Winget's use of the word "they" to mean Lineberry, Dorathy, and J.C.'s assistant football coach, Beauchamp.  From this conversation, Pettitt also understood that, Lineberry, Dorathy, and Beauchamp had communicated with one another and agreed to characterize these alleged emails as harassing all-the-while failing to disclose to Deputy Winget the District's ban, including the requirement that Pettitt submit permission requests via email.

93.    Lineberry's, Dorathy's, and Beauchamp's false reports to police were clearly unlawful in Arizona, including at least under A.R.S. § 13-2907.01.

94.    Shortly thereafter, on or around July 10, 2022, the Gila County Attorney's Office charged Pettitt with one count of harassment in violation of A.R.S. § 13-2921(A)(1), a class 1 misdemeanor.

95.    A.R.S. § 13-2921(E) defines "harassment" to mean "conduct that is [1] directed at a specific person *and* [2] that would cause a reasonable person to be *seriously* alarmed, annoyed, humiliated or mentally distressed *and* [3] the conduct *in fact seriously* alarms, annoys, humiliates or mentally distressed the person." (emphasis added).

96.    Further, A.R.S. § 13-2921(A)(1) requires showing that a person "knowingly" committed an act or acts of harassment.

97.    The misdemeanor citation was based on only three emails, namely:

a.    An email dated July 3, 2022, from Pettitt's email address to Lineberry and Dorathy stating: "I am requesting to attend any event that [my

- 18 -

sons] may be participating in this week on MUSD property.  Thank you.  Dr. Pettitt."

    b.    An email dated July 4, 2022, from Pettitt's email address to Lineberry and Dorathy stating, "I am requesting to attend the game on Wed."

    c.    An email dated July 5, 2022, from Pettitt's email address to Lineberry and Dorathy stating, "I am requesting to attend the game on Mon."

    d.    True and accurate copies of the July 3-5, 2022 emails are attached to this Complaint as Exhibit 4.

98.    None of these emails, whether viewed individually or collectively, constitute harassment as they would not cause a reasonable person to be seriously alarmed, annoyed, humiliated, or mentally distressed.  Additionally, none of these emails were knowingly sent by Pettitt because all of the Defendants believed that these were "automated" emails, which necessarily indicates a lack of awareness or consciousness of an act to harass.

99.    After commencing the misdemeanor criminal action, the Gila County Attorney's Office continued to request continuances of the arraignment and pretrial conference.

100.    On October 10, 2022, the Gila County Attorney's Office moved to dismiss the case in the interest of justice.

101.    Later that same day, the Court dismissed the action without prejudice.

102.    A few days after the dismissal, on October 18, 2022, Beauchamp personally contacted Pettitt's counsel in the now-dismissed misdemeanor action.  Beauchamp stated that "he chose" to dismiss the criminal misdemeanor action because he felt "like it was in the best interest of both parties [Lineberry and Pettitt]."  He also threatened that he would "refile" the case as a "felony" if Pettitt "harassed the school in the future."

103.    Beauchamp admitted that he conferred with Lineberry and that Lineberry "agreed to the misdemeanor case being dismissed . . . so long as Ms. Pettitt" complied with the District's unlawful ban.

104. In short, before any indictment for a felony, Beauchamp and Lineberry were wielding the threat of a felony prosecution over Pettitt to further chill and bully her in retaliation for exercising her First Amendment rights and other constitutionally protected activities.

**LINEBERRY, DORATHY, AND BEAUCHAMP FURTHER RETALIATE AGAINST PETTITT FOR EXERCISING HER CONSTITUTIONAL RIGHTS**

*Pettitt Angered Lineberry for Lawfully Exercising Her Constitutional Rights to Vote and Campaign for a School Board Candidate*

105. Given her significant dissatisfaction with the District's current leadership, Pettitt began campaigning in the summer of 2022 for new members of the District's governing board. In particular, she advocated for a write-in candidate, Brittany Pearsall.

106. Pettitt's assigned polling place for Arizona's November 2022 general election was on the District's property.

107. Because of the ban's unconstitutional and unlawful scope, Pettitt had to request permission from Dorathy and Lineberry to effectively vote, which Pettitt obtained from Dorathy. This burden on her right to vote was unlawful.

108. On November 8, 2022, Pettitt went onto the District's property to vote. That same day, along with other voters, Pettitt helped set up a small table and distribute cards with the spelling of Brittany Pearsall's name because Pearsall was a write-in candidate—all of which took place on the District's property outside the requisite 75-foot limit from the polling place. These activities were never reported, investigated, or charged by law enforcement because they were entirely lawful.

109. Lineberry, however, became enraged when he learned that Pettitt was on the District's property that day to vote and to advocate for a school board candidate. He immediately called Beauchamp, falsely reported that Pettitt was still harassing him and the School, and demanded that Beauchamp prosecute her. Dorathy approved of, ratified, and agreed with Lineberry's demand to re-prosecute Pettitt.

110. Beauchamp has admitted that the Gila County Attorney's Office prosecuted Pettitt at Lineberry's request and insistence, stating in writing that Pettitt "was not allowed

- 20 -

to campaign on the property of the Miami Unified School District while she was there to vote" and that "Glen Lineberry immediately reported the harassing behavior had not stopped and asked the State to review the original case."

111. Beauchamp engaged in these actions in an administrative or investigative capacity beyond the prosecutorial function, before any determination of probable cause was made, outside of any statutory or judicial forum, in his capacity as advising or consulting with Dorathy and Lineberry about their claims and reports, and/or in his capacity as an agent of the School and District.

*At Lineberry, Dorathy, and Beauchamp's Direction, Pettitt Is Maliciously Prosecuted for Aggravated Harassment but Is Ultimately Acquitted by a Jury*

112. Three weeks later, Beauchamp did as Lineberry requested and directed the Gila County Attorney's Office to prosecute Pettitt.

113. On November 29, 2022, a grand jury indicted Pettitt for three counts of aggravated harassment, in violation of A.R.S. §§ 13-2921.01(A)(1) and 13-2921, a class 6 felony with a presumptive prison sentence of at least one year.

114. A.R.S. § 13-2921.01(A)(1) requires showing, among other things, that a person has committed "harassment" in violation of § 13-2921. In other words, the State had to prove that the conduct is "[1] directed at a specific person *and* [2] that [it] would cause a reasonable person to be *seriously* alarmed, annoyed, humiliated or mentally distressed *and* [3] the conduct *in fact seriously* alarms, annoys, humiliates or mentally distressed the person." A.R.S. § 13-2921(E).

115. The indictment, however, was not based on any new allegations, including the November 8, 2022 allegations. Instead, the indictment was based only on the same three emails sent on July 3, 4, and 5, 2022 as detailed in Paragraph 97(a)-(d) of this Complaint.

116. To secure the indictment, the State presented only one witness, Deputy Winget, who presented false and misleading testimony to the grand jury. For example, Deputy Winget testified that Pettitt was not permitted to send emails to the District "when school was not in session, because there are no activities going on." But that testimony is

- 21 -

false because the District's ban plainly permits Pettitt to email Lineberry and Dorathy "at any time" regarding her sons' education.

117.   Deputy Winget further falsely testified that, prior to the injunction against harassment, Pettitt had sent Lineberry emails "by the hundreds."  Not only is this factually untrue, but Deputy Winget materially and misleadingly omitted testifying about the District's ban, which would thus provide important, exculpatory context for Pettitt's conduct and email history.

118.   The Gila County Attorney's Office also suppressed and did not show the grand jury the three alleged harassing emails—which are exculpatory and undermine any finding of harassment.  Whether viewed individually or collectively, none of these emails constitute harassment as they would not cause a reasonable person to be seriously alarmed, annoyed, humiliated, or mentally distressed, particularly if provided truthful and accurate context that the District's ban required Pettitt to request permission via email to access the District's property.

119.   The State conducted two criminal trials against Pettitt.  During the first trial, Dorathy and Lineberry testified against Pettitt and provided false, misleading, and fabricated testimony.  For instance, Dorathy and Lineberry testified that Pettitt violated the District's ban by sending emails outside of business hours.  But nowhere does the District's ban set time parameters for when Pettitt could email the School's administrators.  Indeed, the District's ban indicates that Pettitt may email Lineberry and Dorathy "at any time."  They both falsely testified that Pettitt sent "hundreds" of demanding emails, which was untrue.

120.   During the first trial, the Court declared a mistrial because the three alleged harassing emails sent on July 3, 4, and 5—the very emails that served as the basis for the harassment charges—were not provided to the jury during their deliberations.

121.   Following the mistrial, Lineberry and Dorathy—in consultation with Beauchamp—wanted and agreed to proceed with a second trial.  And so, the State elected to try Pettitt again.  During the second trial, Dorathy and Lineberry again provided false,

- 22 -

misleading, and fabricated testimony, including that Pettitt sent "hundreds" of demanding and harassing emails.

122. On January 31, 2025, and after the close of evidence and arguments, the jury deliberated for a little less than 40 minutes and found Pettitt "not guilty" on all counts, thereby acquitting her.

### PETTITT HAS SUFFERED SUBSTANTIAL DAMAGES AS A RESULT OF DEFENDANTS' RETALIATION

123. As a direct and proximate result of Defendants' retaliation (including causing Pettitt to be prosecuted for baseless criminal felony charges), Pettitt has incurred over $140,000 in attorneys' fees and costs.

124. Pettitt also had to defend her medical license before the state regulatory board because of these false criminal charges.

125. She also sustained great emotional, mental, physical, and reputational pain, suffering, distress, and other related harm arising out of these baseless charges and retaliatory conduct.

126. Lineberry, Dorathy, and Beauchamp acted with a sufficient evil mind and evil hand to warrant the imposition of punitive damages. In particular, they set into motion the parade of horribles that they used to institute baseless criminal charges against Pettitt in order to bully and chill her protected activities (constitutional or otherwise), including by: (a) imposing an unconstitutional, unlawful, and facially unreasonable ban; (b) wrongfully obtaining through false and misleading evidence an invalid and void injunction against Pettitt that required her to comply with the District's unlawful ban; and (c) directing, requesting, or pressuring for the prosecution of Pettitt on baseless charges that ultimately resulted in her acquittal.

127. As a result of Lineberry, Dorathy, and Beauchamp's retaliation and abuse, Pettitt's youngest son changed school districts to attend a new high school.

- 23 -

**To This Day, Pettitt Continues to Be Subject to the District's Unlawful Ban**

128. Because the District's ban is indefinite, Pettitt is still banned from accessing the District's property at any time for any events, including events hosted by an outside organization on the District's property or school events opened to the public. Due to this ban, Pettitt has not attended various public events on the School and District's property, including sporting events, board meetings, or other community events taking place in 2024 and 2025 that she would have liked to attend.

129. Further, to avoid violating the District's ban, Pettitt will at times email the District's Superintendent to request permission to come onto the District's Property—which is an unreasonable burden on her rights.

130. For example, on December 2, 2025, the District organized a sudden candlelight vigil at 6 p.m. in honor of a deceased student who attended the School and was the victim of a violent crime. This student was a friend of Pettitt's youngest son when he attended the School. The District invited the public to attend this candlelight vigil.

131. Because of her son's relationship with his deceased friend, Pettitt emailed the School's new Superintendent, Richard Ramos, requesting permission to attend the candlelight vigil. In her email, Pettitt stated: "In accordance with the letter from the Miami Unified School District #40 dated August 25, 2021, I am requesting permission to attend the vigil being held for [deceased student] tonight, December 2, 2025, at 6:00 PM at Miami High School."

132. The District approved the request, authorizing Pettitt to escort her son to the vigil and reaffirming that the ban remained in effect.

133. In sum, Pettitt remains subject to the District's ban, including having to request permission to attend school or District events involving her children.

134. The District's ban of Pettitt is a policy or custom of the District as the District has imposed similar bans against other parents within the District.

135. The District's alleged liability arises from, among other things, one or more of the following: official policies of the District; practices or customs of the District; actions through final policymakers of the District; actions ratified by final policymakers of the District; and the District's failure to train.

**COUNT I**

**For Violation of Rights Under 42 U.S.C. § 1983**

**(Malicious Prosecution, Conspiracy to Commit Malicious Prosecution, and**

**Deprivation of Civil Rights)**

**Against All Defendants**

136. Pettitt incorporates by reference the above allegations.

137. Defendants, including Lineberry, Dorathy, and Beauchamp, individually and collectively took an active part in and conspired to wrongfully cause the prosecution of a criminal felony action against Pettitt, including by, among other things: (i) initiating, directing, requesting, or pressuring the Gila County Attorney's Office to prosecute Pettitt, by knowingly providing false or materially incomplete information to the prosecutor; (ii) concealing exculpatory evidence; (iii) providing false or materially incomplete testimony at the criminal trials of Pettitt; and (iv) prosecuting Pettitt for allegedly violating a void and invalid injunction.

138. The criminal action terminated in Pettitt's favor, with an acquittal on all counts, on January 31, 2025.

139. Defendants acted without probable cause because, among other things: (i) the District's ban expressly required Pettitt to request attendance by email, and Lineberry and Dorathy repeatedly approved Pettitt's attendance requests by email; (ii) the ban did not prohibit automated or after-business hour emails; (iii) the July 3-5, 2022 emails were brief and non-threatening, and thus, none of these emails were harassing because a reasonable person would not to be seriously alarmed, annoyed, humiliated, or mentally distressed by these emails, particularly in light of the District's ban against Pettitt; (iv) the Defendants reasonably believed that Pettitt did not knowingly send these emails because they believed

- 25 -

that they were automated emails; and (v) Defendants demanded and pressured for a felony prosecution only after dismissing the criminal misdemeanor charges and only after becoming enraged that Pettitt went onto the District's property to lawfully vote and engage in protected political speech and assembly.

140.  Defendants acted with malice or a primary purpose other than bringing Pettitt to justice because, among other reasons, they sought and intended to deprive Pettitt of her constitutional rights and to retaliate against her by means of prosecution for exercising those constitutional rights, including her First and Fourteenth Amendment rights regarding freedom of speech, the right to vote, the right to peaceably associate and assemble, the right to petition for a redress of grievances, due process of law, and the right to direct and control the education and upbringing of her children.

141.  Defendants' malicious conduct has injured and damaged Pettitt in an amount to be proven at trial, including for attorneys' fees, costs, and other expenses incurred in defending against Defendants' retaliatory actions (including a baseless criminal prosecution), attorneys' fees, costs, and other expenses incurred defending her medical license, and great emotional, mental, physical, reputational, pain, suffering, distress, and other related harms.

142.  The acts and omissions of Defendants, including acting in their individual capacities and under color of law, were malicious, punitive, and in reckless disregard of Pettitt's rights.  As a result, punitive damages in an amount to be determined by a jury should be awarded against Defendants to punish them for their wrongdoing and to prevent them and others from acting in a similar manner in the future.

**COUNT II**

**For Violation of Rights Under 42 U.S.C. § 1983**

**(First Amendment Retaliation)**

**Against All Defendants**

143.  Pettitt incorporates by reference the above allegations.

144.  Pettitt engaged in constitutionally protected activity under the First

Amendment, such as speaking out, publicly criticizing school officials (including Lineberry), filing complaints with the school board and the AZDOE regarding Lineberry, peacefully assembling and associating, voting, and engaging in political speech, electioneering, and campaigning.

145. Defendants took action that would chill or silence a person of ordinary firmness from future First Amendment activities, including by: (i) prosecuting Pettitt for criminal felony charges in retaliation for voting and campaigning for a particular candidate; (ii) categorically and prospectively banning her from the District's property, including for public events such as board meetings and public events—a ban that still remains in effect to this day, because of Pettitt's criticism of school officials and the filing of an AZDOE complaint against a school official; and (iii) obtaining an invalid and void injunction based on false and misleading evidence requiring Pettitt to comply with the District's unlawful and unconstitutional ban.

146. Defendants' desire to cause the chilling effect was a but-for cause of their action because, among other things: (i) Defendants engaged in their chilling and retaliatory conduct immediately or shortly after reading, hearing, or seeing Pettitt engage in her protected First Amendment activities; (ii) Lineberry and Dorathy referenced or alluded to certain protected activities in the District's August 21, 2021 letter banning Pettitt from the District's Property; (iii) Beauchamp has admitted in writing that Lineberry requested and demanded the prosecution of Pettitt after seeing her vote and campaign on the District's property; (iv) before notifying Pettitt, Defendants spread information and news about the District's ban against Pettitt, including to J.C.'s father and his counsel, to attempt to shame and silence Pettitt; and (v) adverse, retaliatory actions escalated only after Pettitt engaged in protected First Amendment activities.

147. Defendants lacked probable cause for the criminal prosecution because, among other things: (i) the District's ban expressly required Pettitt to request attendance by email, and Lineberry and Dorathy repeatedly approved Pettitt's attendance requests by email; (ii) the ban did not prohibit automated or after-business hour emails; (iii) the July 3-

SNELL & WILMER

5, 2022 emails were brief and non-threatening, and thus, none of these emails were harassing because a reasonable person would not to be seriously alarmed, annoyed, humiliated, or mentally distressed by these emails, particularly in light of the District's ban against Pettitt; (iv) the Defendants reasonably believed that Pettitt did not knowingly send these emails because they believed that they were automated emails; and (v) Defendants demanded and pressured for a felony prosecution only after dismissing the criminal misdemeanor charges and only after becoming enraged that Pettitt went onto the District's property to lawfully vote and engage in protected political speech and assembly.

148. Defendants' malicious conduct has injured and damaged Pettitt in an amount to be proven at trial, including for attorneys' fees, costs, and other expenses incurred in defending against Defendants' retaliatory actions (including a baseless criminal prosecution), attorneys' fees, costs, and other expenses incurred defending her medical license, and great emotional, mental, physical, reputational, pain, suffering, distress, and other related harms.

149. The acts and omissions of Defendants, including acting in their individual capacities and under color of law, were malicious, punitive, and in reckless disregard of Pettitt's rights. As a result, punitive damages in an amount to be determined by a jury should be awarded against Defendants to punish them for their wrongdoing and to prevent them and others from acting in a similar manner in the future.

### COUNT III

**Declaratory Judgment**

**Against the District**

150. Pettitt incorporates by reference the above allegations.

151. The U.S. Constitution, including under the First and Fourteenth Amendments, the Arizona Constitution, and Arizona law prohibit government officials from abridging freedom of speech, the right to vote, the right to peaceably associate and assemble, and the right to petition for a redress of grievances.

152. The Due Process Clause of the Fourteenth Amendment, the Arizona Constitution, and other Arizona laws also bar government officials from infringing the fundamental rights of parents to make decisions concerning the care, education, and upbringing of their children and from depriving parents of their constitutional rights or other protected rights (including by abridging freedom of speech and the right to assemble and retaliating against those parents because of their speech and association) without due process of law.

153. A.R.S. § 1-601 provides that Pettitt has "a fundamental right" "to direct the upbringing, education, health care and mental health of [her] children" and that any governmental entity "shall not infringe on these rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." Section 1-602(F) further requires the government entity to prove that any interference with a parent's fundamental rights to direct their child's education "is essential to accomplish a compelling government interest of the highest order, as long recognized in the history and traditions of this state in the operation of its regulatory powers" and that "the method . . . used by the government is narrowly tailored and is not otherwise served by a less restrictive means."

154. Arizona laws likewise bars government officials and entities from prohibiting persons from engaging in electioneering and other political speech. For instance, A.R.S. § 16-411(I), which was previously numbered A.R.S. § 16-411(H), states that "any facility that is used as a polling place on election day or that is used as an early voting site during the period of early voting *shall allow* persons to electioneer and engage in other political activity outside of the seventy-five foot limit . . . in public areas and parking lots used by voters." (emphasis added).

155. Arizona law provides that "[a] public vote shall be taken before any legal action binds the public body." A.R.S. § 38-431.03(D).

- 29 -

156. By implementing this indefinite ban that still applies to Pettitt to this day, the District and those acting in concert with it have violated these above laws and will continue violating them unless enjoined by the Court.

157. Pettitt therefore seeks a declaration, pursuant to 28 U.S.C. § 2201 and A.R.S. § 12-1831 *et seq.*, that, among other things, the District's ban: (a) violates Pettitt's First and Fourteenth Amendment rights, including freedom of speech, the right to vote, the right to peaceably assemble and associate, the right to petition for grievances, the Due Process Clause, and the right to direct and control the education of her children; and (b) violates Pettitt's rights under the Arizona Constitution (including but not limited to Article 2, § 4 (due process of law), § 5 (the right to petition and peaceably assemble), § 6 (freedom of speech), Article 7 (voting)), and Arizona law (including but not limited to A.R.S. §§ 1-601, 1-602, and 16-411).

158. To the extent the District's governing board did not approve the legal action that the District commenced against Pettitt (including the petition for an injunction against workplace harassment in June 2022), Pettitt seeks a declaration, pursuant to 28 U.S.C. § 2201 and A.R.S. § 12-1831 *et seq.*, that, among other things, the District's legal actions (including commencing a legal action to petition for an injunction and any resulting injunction/order) are null and void *ab initio*, including under A.R.S. § 38-441.05, and never existed or had any effect; and that the District violated Arizona's open-meeting laws, including under A.R.S. § 38-431 *et seq.*

159. Pettitt seeks an injunction prohibiting the District, and those acting in concert with them or subject to their supervision, from barring her from any public events or public meetings on the District's property and from prohibiting her from emailing government employees at the District.

## COUNT IV

**Malicious Prosecution and Conspiracy to Commit Malicious Prosecution**

**Against All Defendants**

160. Pettitt incorporates by reference the above allegations.

- 30 -

161. Defendants, including Lineberry, Dorathy, and Beauchamp, individually and collectively, took an active part in and conspired to wrongfully cause the prosecution of a criminal felony action against Pettitt, including by, among other things: (i) initiating, directing, requesting, or pressuring the Gila County Attorney's Office to prosecute Pettitt, by knowingly providing false or materially incomplete information to the prosecutor; (ii) concealing exculpatory evidence; and (iii) providing false or materially incomplete testimony at the criminal trials of Pettitt.

162. The criminal action terminated in Pettitt's favor, with an acquittal on all counts, on January 31, 2025.

163. Defendants acted without probable cause because, among other things: (i) the District's ban expressly required Pettitt to request attendance by email, and Lineberry and Dorathy repeatedly approved Pettitt's attendance requests by email; (ii) the ban did not prohibit automated or after-business hour emails; (iii) the July 3-5, 2022 emails were brief and non-threatening, and thus, none of these emails were harassing because a reasonable person would not be seriously alarmed, annoyed, humiliated, or mentally distressed by these emails, particularly in light of the District's ban against Pettitt; (iv) the Defendants reasonably believed that Pettitt did not knowingly send these emails because they believed that they were automated emails; and (v) Defendants demanded and pressured for a felony prosecution only after dismissing the criminal misdemeanor charges and only after becoming enraged that Pettitt went onto the District's property to lawfully vote and engage in protected political speech and assembly.

164. Defendants acted with malice or a primary purpose other than bringing Pettitt to justice because, among other reasons, they sought and intended to deprive Pettitt of her constitutional rights and to retaliate against her by means of prosecution for exercising those constitutional and statutory rights, including: (i) her First and Fourteenth Amendment rights regarding freedom of speech, the right to vote, the right to peaceably associate and assemble, the right to petition, due process of law, and the right to direct and control the education and upbringing of her children; and (ii) her rights under the Arizona Constitution

(including but not limited to Article 2, § 4 (due process of law), § 5 (the right to petition and peaceably assemble), § 6 (freedom of speech), Article 7 (voting)), and Arizona law (including but not limited to A.R.S. §§ 1-601, 1-602, and 16-411).

165. Defendants' malicious conduct has injured and damaged Pettitt in an amount to be proven at trial, including for attorneys' fees, costs, and other expenses incurred in defending against Defendants' retaliatory actions (including a baseless criminal prosecution), attorneys' fees, costs, and other expenses incurred defending her medical license, and great emotional, mental, physical, reputational, pain, suffering, distress, and other related harms.

166. The acts and omissions of Defendants, including acting in their individual capacities and under color of law, were malicious, punitive, and in reckless disregard of Pettitt's rights. As a result, punitive damages in an amount to be determined by a jury should be awarded against Defendants to punish them for their wrongdoing and to prevent them and others from acting in a similar manner in the future.

## COUNT V

### Abuse of Process

### Against All Defendants

167. Pettitt incorporates by reference the above allegations.

168. Defendants willfully used the judicial process, including but not limited to by prosecuting Pettitt and proceeding with the continuation of a second, baseless criminal trial against her in January 2025, falsely testifying in that second trial, and, to the extent the District's governing board did not approve or properly approve seeking an injunction against Pettitt, improperly prosecuting Pettitt for violating an injunction against harassment that is null and void *ab initio* and has no legal or factual effect as a matter of law.

169. Defendants used that criminal legal proceeding, including the second trial, to primarily accomplish a perverted and or improper use: to retaliate against Pettitt for exercising her constitutional and statutory rights under both federal and Arizona law and to chill and silence Pettitt from exercising those rights in the future.

170. Defendants' malicious conduct has injured and damaged Pettitt in an amount to be proven at trial, including for attorneys' fees, costs, and other expenses incurred in defending against Defendants' retaliatory actions (including a baseless criminal prosecution), attorneys' fees, costs, and other expenses incurred defending her medical license, and great emotional, mental, physical, reputational, pain, suffering, distress, and other related harms.

171. The acts and omissions of Defendants, including acting in their individual capacities and under color of law, were malicious, punitive, and in reckless disregard of Pettitt's rights. As a result, punitive damages in an amount to be determined by a jury should be awarded against Defendants to punish them for their wrongdoing and to prevent them and others from acting in a similar manner in the future.

### COUNT VI

### For Violations of Art. 2, § 6 of the Arizona Constitution

### (Free Speech Retaliation)

### Against All Defendants

172. Pettitt incorporates by reference the above allegations.

173. Article 2, § 6 of the Arizona Constitution provides that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."

174. Pettitt engaged in constitutionally protected activity under Art. 2, § 6 of the Arizona Constitution, such as speaking out, publicly criticizing school officials (including Lineberry), filing complaints with the school board and the AZDOE regarding Lineberry, peacefully assembling and associating, voting, and engaging in political speech, electioneering, and campaigning.

175. Defendants took action that would chill or silence a person of ordinary firmness from future free speech activities under Art. 2, § 6 of the Arizona Constitution, including by: (i) prosecuting Pettitt for criminal felony charges in retaliation for voting and campaigning for a particular candidate; (ii) categorically and prospectively banning her from the District's property, including from public events such as board meetings and public

- 33 -

events—a ban that still remains in effect to this day—because of Pettitt's criticism of school officials and the filing of an AZDOE complaint against a school official; and (iii) obtaining an invalid and void injunction based on false and misleading evidence requiring Pettitt to comply with the District's unlawful and unconstitutional ban.

176. Defendants' desire to cause the chilling effect was a but-for cause of their action because, among other things: (i) Defendants engaged in their chilling and retaliatory conduct immediately or shortly after reading, hearing, or seeing Pettitt engage in her protected free speech activities; (ii) Lineberry and Dorathy referenced or alluded to certain protected activities in the District's August 21, 2021 letter banning Pettitt from the District's property; (iii) Beauchamp has admitted in writing that Lineberry requested and demanded the prosecution of Pettitt after seeing her vote and campaign on the District's property; (iv) before notifying Pettitt, Defendants spread information and news about the District's ban against Pettitt, including to J.C.'s father and his counsel, in an attempt to shame and silence Pettitt; and (v) adverse, retaliatory actions escalated only after Pettitt engaged in protected First Amendment activities.

177. Defendants' retaliatory conduct has injured and damaged Pettitt in an amount to be proven at trial, including for attorneys' fees, costs, and other expenses incurred in defending against Defendants' retaliatory actions (including a baseless criminal prosecution), attorneys' fees, costs, and other expenses incurred defending her medical license, and great emotional, mental, physical, reputational, pain, suffering, distress, and other related harms.

178. The acts and omissions of Defendants, including acting in their individual capacities and under color of law, were malicious, punitive, and in reckless disregard of Pettitt's rights. As a result, punitive damages in an amount to be determined by a jury should be awarded against Defendants to punish them for their wrongdoing and to prevent them and others from acting in a similar manner in the future.

## COUNT VII

### Intentional Infliction of Emotional Distress

### Against All Defendants

179.   Pettitt incorporates by reference the above allegations.

180.   Defendants' conduct was extreme and outrageous, as evidence by, among other things, (i) their prosecution of Pettitt for criminal felony charges in retaliation for voting and campaigning for a particular candidate; (ii) their categorical and prospective ban of Pettitt from the District's property, including from public events such as board meetings and public events—a ban that still remains in effect to this day—because of Pettitt's criticism of school officials and the filing of an AZDOE complaint against a school official; and (iii) their efforts to obtain an invalid and void injunction based on false and misleading evidence requiring Pettitt to comply with the District's unlawful and unconstitutional ban.

181.   Defendants' extreme and outrageous conduct was in retaliation for Pettitt's speech on matters of public interest and concern, including public criticisms of Lineberry's character and fitness to serve as a public officer of the School, filing complaints (including with the AZDOE) regarding Lineberry's actions, and voting and campaigning for a write-in candidate for the District's governing board.

182.   Defendants either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from their conduct.

183.   Defendants' actions caused Pettitt to suffer severe emotional distress, in an amount to be proven at trial.

184.   The acts and omissions of Defendants, including acting in their individual capacities and under color of law, were malicious, punitive, and in reckless disregard of Pettitt's rights.  As a result, punitive damages in an amount to be determined by a jury should be awarded against Defendants to punish them for their wrongdoing and to prevent them and others from acting in a similar manner in the future.

### JURY DEMAND

185.   Pettitt demands a trial by jury.

- 35 -

**PRAYER FOR RELIEF**

Pettitt requests judgment against all Defendants, jointly and severally, as follows:

A.    An award of general and compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Defendants' wrongdoing;

B.    An award of nominal damages;

C.    An award of punitive damages;

D.    An award of injunctive and declaratory relief;

E.    An award of attorneys' fees and costs, incurred in connection with this litigation, including but not limited to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and A.R.S. § 1-602(G).

F.    An award of pre-judgment and post-judgment interest at the maximum legal rate;

G.    All other remedies or relief afforded by 42 U.S.C. § 1983; and

H.    Such other and further relief as the Court may deem just and proper.

DATED this 28th day of January, 2026.

SNELL & WILMER L.L.P.


By: *s/ Patrick A. Tighe*
Patrick A. Tighe
Matthew Racioppo
One East Washington St., Suite 2700
Phoenix, Arizona 85004-2556

*Attorneys for Plaintiff*
*Michelle Pettitt*

- 36 -